## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| TYLER BAKER *individually and on behalf of all others similarly situated*, | Case No. _____ |
| Plaintiff, | Hon. |
| v. | **JURY TRIAL DEMANDED** |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Tyler Baker ("Plaintiff") brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class Members," as defined below), against Defendant Hartford Life and Accident Insurance Company ("The Hartford" or "Defendant") alleging as follows based upon information and good faith belief and due investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

## NATURE OF THE ACTION

1.     Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard personally identifiable information including, but not limited to, Plaintiff's and Class Members' social security number, first name, last name, date of birth, and home state and zip code (collectively, "PII"). Defendant's severe failures have affected— and continue to affect— a class of almost 47 thousand people in Texas alone.[1]

---

[1]     The Hartford filed a data breach notice with the Attorney General of Texas, which provides extremely limited information about the number of people affected by this data breach https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Aug. 9, 2023). As detailed herein, The Hartford to-date has not filed a required notice with the

2.      Defendant "The Hartford and its subsidiaries offer life, health, home, business, and accident insurance to individuals, families, groups, and businesses across the world."[2]

3.      Plaintiff is a former employee of University of Vermont Health Network ("UVM Health"), which contracted with Defendant to ensure accurate payments/distribution on UVM Health employee disability and life insurance claims through audit services.

4.      Plaintiff was a client of The Hartford since at least May 2009 until June 2018, and again since December 2020 until March 27, 2023.

5.      During its business operations, Defendant acquired, collected, utilized, and derived a benefit from Plaintiff's and Class Members' PII. Therefore, Defendant owed and otherwise assumed statutory, regulatory, and common law duties and obligations, including to keep Plaintiff's and Class Members' PII confidential, safe, secure, and protected from the type of unauthorized access, disclosure, and theft that occurred in the data breach described herein.

6.      On August 3, 2023, Plaintiff received an email notification from UVM Health stating they have been informed by The Hartford that plaintiff's information including social security number, first name, last name, date of birth, and home state and zip code has been breached because one of The Hartford subcontractors, PBI Research Services ("PBI"), has experienced a cybersecurity breach (the "Data Breach").[3]

---

U.S. Department of Health and Human Services' ("HHS") Office for Civil Rights ("OCR") and has not sent any notices to its clients whose data has been compromised.

[2]      The Hartford Life and Accident Insurance Company Files Notice of Data Breach Impacting Thousands, JDSupra (August 8, 2023), https://www.jdsupra.com/legalnews/the-hartford-life-and-accident-5426280/ (last visited Aug. 9, 2023).

[3]      While the email from UVM Health does not mention when PBI experienced the breach, other sources state that hackers accessed PBI's MOVEit Transfer servers in a series of data-theft attacks in May 2023. *See, e.g.*, https://www.bleepingcomputer.com/news/security/colorado-state-

7.     Other than the email notification from his former employer, Plaintiff is yet to receive any information from Defendant regarding the details of the breach.

8.     Defendant has not yet revealed when the breach took place or if an investigation into this data breach was carried out.

9.     Defendant has not yet outlined any steps regarding their plans to keep similar PII safe both now and into the future.

10.    Defendant did not outline any steps Plaintiff may take following this breach—instead the email notification generally referred to "more information about the breach by mail" arriving in the coming days.

11.    As of the date of this Complaint, Defendant has not yet posted notice of this data breach on its website.

12.    Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII that it collected and maintained, and for failing to provide adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

13.    Upon information and belief, Defendant maintained the PII in a negligent manner. In particular, PII was maintained on computer systems and networks that were in a condition vulnerable to cyberattack. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to

---

university-says-data-breach-impacts-students-staff/;        https://cybernews.com/news/pbi-data-breach-moveit/ (last visited Aug. 10, 2023).

Defendant; and, thus, Defendant was on notice that failing to take appropriate protective measures would expose and increase the risk that the PII could be compromised and stolen.

14.     Hackers can offer for sale the unencrypted, unredacted PII to criminals. The exposed PII of Plaintiff and Class Members can, and likely will, be sold repeatedly on the dark web.

15.     Plaintiff and Class Members now face a current and ongoing risk of identity theft, which is heightened here by the loss of Social Security numbers—the gold standard for identity thieves.

16.     This PII was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect the PII of Plaintiff and Class Members.

17.     As a result of this data breach, Plaintiff's and Class Members' PII has been compromised, and they are, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

18.     While many details of the Data Breach remain in the exclusive control of Defendant, upon information and belief, Defendant breached its duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately encrypt the PII; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, and (9) otherwise failing to secure

the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

19.     As a result of Defendant's unreasonable and inadequate data security practices that resulted in the Data Breach, Plaintiff and Class Members are at a current and ongoing risk of identity theft and have suffered numerous actual and concrete injuries and damages, including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their PII; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

20.     Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose PII was accessed during the Data Breach. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, future costs of identity theft monitoring, and injunctive relief including improvements to Defendant's data security systems, and future annual audits.

21.     Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of implied contract, (iii) unjust enrichment, (iv) breach of fiduciary duty, (v) invasion of privacy, (vi) breach of confidence, and (vii) declaratory judgement.

**PARTIES**

22.     Plaintiff Tyler Baker is an adult who, at all relevant times, was a resident and a citizen of the State of Vermont, residing in Underhill, Vermont.

23.     Defendant Hartford Life and Accident Insurance Company is a national insurance company organized under the laws of Connecticut with its principal place of business at One Hartford Plaza in Hartford, Connecticut 06155. The Hartford and its subsidiaries offer life, health, home, business, and accident insurance to individuals, families, groups, and businesses across the world. Defendant can be served through its registered agent, CT Corporation System, 67 Burnside Ave, East Hartford in Connecticut 06108.

**JURISDICTION & VENUE**

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs.

25.     This Court has personal jurisdiction over Defendant because it maintains its principal place of business in Connecticut and/or regularly conducts business in this State.

26.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant's principal place of business is located in this District and a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District.

## FACTUAL BACKGROUND

**A.    The Data Breach.**

27.    On August 7, 2023, The Hartford filed a notice of data breach with the Attorney General of Texas.[4]

28.    Notably, Hartford's filing with the Attorney General of Texas lacks a link to the actual Notice of Data breach. [5]

29.    As of the date of this Complaint, Defendant has not yet posted notice of this data breach on its website.

30.    The only information available to Plaintiff comes from an email notification from UVM Health—his former employer—sent on August 3, 2023. UVM Health—not Defendant—notified Plaintiff that they have been informed by The Hartford that information including social security number, first name, last name, date of birth, and home state and zip code has been breached.

31.    Other than the email notification from his former employer, Plaintiff is yet to receive any information from Defendant regarding any details of the breach, which occurred *at least* over two months ago. For example, Defendant has not yet revealed if an investigation into this data breach was carried out, has not yet outlined any steps regarding their plans to keep similar PII safe both now and into the future, and has not yet outlined any steps Plaintiff may take following this breach.

32.    UVM Health email notification only referred to "more information about the breach by mail" arriving in the coming days.

---

[4]       *See supra*, note 1.

[5]       *See id.*

**B.      Representative Plaintiff's Experience.**

33.      As a requisite to receiving insurance services from Defendant, Plaintiff provided his PII to Defendant and trusted that the information would be safeguarded according to state and federal law. Upon receipt, PII was entered and stored on Defendant's network and systems.

34.      Plaintiff is very careful about sharing his sensitive PII. Plaintiff has never knowingly transmitted unencrypted sensitive PII.

35.      Plaintiff stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts. Had he known Defendant failed to follow basic industry security standards and failed to implement systems to protect his PII, he would not have provided that information to Defendant.

36.      The email notice notified Plaintiff that Defendant's network had been accessed and Plaintiff's PII including social security number, first name, last name, date of birth, and home state and zip code has been breached.

37.      Yet, the email notice—or Defendant—have not yet provided Plaintiff with any instructions about steps Plaintiff could take to protect his PII and otherwise mitigate his damages.

38.      As a result of the Data Breach, and the lack of detailed notification, Plaintiff is anxious about the safety of his information.

39.      In an abundance of caution, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the email notification and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent without any help from the Defendant.

40.     Even with the best response, the harm caused to Plaintiff cannot be undone.

41.     Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's PII—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

42.     He also lost his benefit of the bargain by paying for insurance services that failed to provide the data security that was promised.

43.     Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

44.     Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties and possibly criminals.

45.     Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

46.     Plaintiff has a continuing interest in ensuring that Plaintiff's PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**C.     Cyber Criminals Have Used & Will Continue to Use Plaintiff's PII to Defraud Them.**

47.     PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach can and will be used in a variety of sordid ways for criminals to exploitPlaintiff and the Class Members and to profit off their misfortune.

48.     Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[6] For example, with the PII stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[7] These criminal activities have and will result in devastating financial and personal losses to Plaintiff and the Class Members.

49.     Social security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number. _This is the most dangerous type of personal information in the hands of identity thieves_** because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[8]

(emphasis added.)

---

[6]     "Facts + Statistics: Identity Theft and Cybercrime," Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity") (last visited Aug. 10, 2023).

[7]     _See, e.g._, Christine DiGangi, _5 Ways an Identity Thief Can Use Your Social Security Number_, Nov. 15, 2017, https://www.usatoday.com/story/money/personalfinance/2017/11/15/5-ways-identity-thief-can-use-your-social-security-number/860643001/ (last visited Aug. 10, 2023).

[8]     _Dark Web Monitoring: What You Should Know_, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (last visited Aug. 10, 2023).

50.     PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it for years.[9]

51.     This was a financially motivated Breach, as the only reason the cyber criminals go through the trouble of running a targeted cyberattack against companies like The Hartford is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[10] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[11]

52.     These risks are both certainly impending and substantial. As the Federal Trade Commission ("FTC") has reported, if hackers get access to PII, they ***will*** use it.[12]

53.     Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

>     [I]n some cases, stolen data may be held for up to a year or more

---

[9]     *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737 (last visited Aug. 10, 2023).

[10]     Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, Nov. 15, 2017, https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web (last visited Aug. 10, 2023).

[11]     *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (last visited Aug. 10, 2023).

[12]     Ari Lazarus, *How fast will identity thieves use stolen info?*, May 24, 2017, https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info (last visited Aug. 10, 2023).

before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information ***may continue for years***. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[13]

(emphasis added.)

54.    For instance, with a stolen social security number, which is part of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[14]

55.    The ramifications of Defendant's failure to keep its Class Members' PII secure are long lasting and severe. Once that information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

56.    Further, criminals often trade stolen PII on the "cyber black-market" for years following a breach. Cybercriminals can post stolen PII on the internet, thereby making such information publicly available.

57.    Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[15]

---

[13]    *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737 (last visited Aug. 10, 2023).

[14]    Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 15, 2017, https://www.usatoday.com/story/money/personalfinance/2017/11/15/5-ways-identity-thief-can-use-your-social-security-number/860643001/ (last visited Aug. 10, 2023).

[15]    "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), https://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf    (last visited Aug. 11, 2023).

58.    Despite this, Defendant has so far did not offer even limited identity monitoring to Plaintiff and the Class.

59.    Even if Defendant does offer identity monitoring to affected victims, such coverage usually does not last more than two years. Once the offered coverage has expired, Plaintiff and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to The Hartford's gross negligence. Furthermore, identity monitoring only alerts someone to the fact that they have *already been the victim of identity theft* (*i.e.*, fraudulent acquisition and use of another person's PII)—it does not prevent identity theft.[16] Nor can an identity monitoring service remove personal information from the dark web.[17] "The people who trade in stolen personal information [on the dark web] won't cooperate with an identity theft service or anyone else, so it's impossible to get the information removed, stop its sale, or prevent someone who buys it from using it."[18]

60.    As a direct and proximate result of the Data Breach, Plaintiff and the Class have had their PII exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and continuing increased risk of further harm from fraud and identity theft. Plaintiff and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with

---

[16]    *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, Nov. 30, 2017, https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html (last visited Aug. 10, 2023).

[17]    *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (last visited Aug. 10, 2023).

[18]    *Id.*

credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come. Even more seriously is the identity restoration that Plaintiff and other Class Members must go through, which can include spending countless hours filing police reports, following Federal Trade Commission checklists, and calling financial institutions to cancel fraudulent credit applications, to name just a few of the steps.

61.    Plaintiff and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

      a.  Actual identity theft, including fraudulent credit inquiries and cards being opened in their names;

      b.  Trespass, damage to, and theft of their personal property including PII;

      c.  Improper disclosure of their PII;

      d.  The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and having been already misused;

      e.  Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their PII and that identity thieves have already used that information to defraud other victims of the Data Breach;

      f.  Ascertainable losses in the form of time taken to respond to identity theft and attempt to restore identity, including lost opportunities and lost wages from uncompensated time off from work;

      g.  Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

      h.  Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class members' PII for which there is a well-established and quantifiable national and international market;

      i.  The loss of use of and access to their credit, accounts, and/or funds;

j.   Damage to their credit due to fraudulent use of their PII; and

k.   Increased cost of borrowing, insurance, deposits, and the inability to secure more favorable interest rates because of a reduced credit score.

62.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[19] For example, PII can be sold at a price ranging from $40 to $200.[20] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[21]

63.    Moreover, Plaintiff and Class Members have an interest in ensuring that their information, which remains in the possession of Defendant, is protected from further breaches by the implementation of industry standard security measures and safeguards. Defendant has shown itself wholly incapable of protecting Plaintiff's PII.

64.    Plaintiff and Class Members also have an interest in ensuring that their PII that was provided to The Hartford is removed from The Hartford's unencrypted files.

65.    Plaintiff is desperately trying to mitigate the damage that The Hartford has caused him. Given the kind of PII The Hartford made accessible to hackers, however, Plaintiff is very likely to incur additional damages.

---

[19]    Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Aug. 10, 2023).

[20]    Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Aug. 10, 2023).

[21]    *In the Dark*, VPN Overview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Aug. 10, 2023).

66.     Because identity thieves have his PII, Plaintiff and all Class Members will need to have identity theft monitoring protection for several years and possibly for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number. [22]

**D.     Defendant was Aware of the Risk of Cyber Attacks.**

67.     Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[23] Yahoo,[24] Marriott International,[25] Chipotle, Chili's, Arby's,[26] and others.[27]

68.     The Hartford should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the PII that it collected and maintained.

---

[22]     *Will a New Social Security Number Affect Your Credit?*, LEXINGTON LAW (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html (last visited Aug. 10, 2023).

[23]     Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/ (last visited Aug. 10, 2023).

[24]     Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct.4, 2017), https://www.csoonline.com/article/560623/inside-the-russian-hack-of-yahoo-how-they-did-it.html (last visited Aug. 10, 2023).

[25]     Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/ (last visited Aug. 10, 2023).

[26]     Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/privacy/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/ (last visited Aug. 10, 2023).

[27]     *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/534628/the-biggest-data-breaches-of-the-21st-century.html (last visited Aug. 10, 2023).

69.     Yet, it appears that The Hartford did not meaningfully or comprehensively use reasonable measures to safeguard Plaintiff's and Class Member's PII.

70.     The Hartford was clearly aware of the risks it was taking and the harm that could result from inadequate data security.

**E.     The Hartford Could Have Prevented the Data Breach.**

71.     Data breaches are preventable.[28] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[29] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised."[30]

72.     "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[31]

73.     In a Data Breach like this, many failures laid the groundwork for the Breach. The FTC has published guidelines that establish reasonable data security practices for businesses. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing

---

[28]     Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," in DATABREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

[29]     *Id.* at 17.

[30]     *Id.* at 28.

[31]     *Id.*

risks to computer systems, and implementing safeguards to control such risks.[32] The guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommended that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

74.     Upon information and belief, The Hartford failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines. Upon information and belief, The Hartford also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

75.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[33]

76.     To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Federal

---

[32]     FTC,     Protecting     Personal     Information:     A     Guide     for     Business, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Aug. 10, 2023).

[33]     *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Aug. 10, 2023).

Bureau of Investigation, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only usethem when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[34]

77.    Further, to prevent and detect cyberattacks, including the attack that resulted in the

Data Breach, Defendant could and should have implemented, as recommended by the United

States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself.

  Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (*e.g.*, .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's

---

[34]    *Id.* at 3-4.

security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reducemalicious network traffic….[35]

78.    In addition, to prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**

    - Apply latest security updates
    - Use threat and vulnerability management
    - Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**

    - Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**

---

[35]    *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11,2019), https://www.cisa.gov/news-events/news/protecting-against-ransomware (last visited Aug. 10, 2023).

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**

    - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

    - Monitor for adversarial activities
    - Hunt for brute force attempts
    - Monitor for cleanup of Event Logs
    - Analyze logon events

- **Harden infrastructure**

    - Use Windows Defender Firewall
    - Enable tamper protection
    - Enable cloud-delivered protection
    - Turn on attack surface reduction rules and [Antimalware ScanInterface] for Office [Visual Basic for Applications].[36]

79.    Given that Defendant was storing the Confidential Information of more than 46,940 individuals, Defendant could and should have implemented all of the above measures to prevent and detect malicious cyberattacks.

80.    Specifically, among other failures, The Hartford had far too much confidential unencrypted information held on its systems. Such PII should have been segregated into an

---

[36]    *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at*    https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Aug. 10, 2023).

encrypted system.[37] Indeed, the United States Department of Health and Human Services' Office for Civil Rights urges the use of encryption of data containing sensitive personal information, stating "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[38]

81.     In sum, this Data Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all confidential information. Further, the Data Breach could have likely been prevented had Defendant utilized appropriate malware prevention and detection technologies.

**F.      Defendant's Response to the Data Breach is Inadequate to Protect Plaintiff & the Class.**

82.     Defendant failed to inform Plaintiff and Class Members of the Data Breach in time for them to protect themselves from identity theft.

83.     In fact, at the time of filing this Complaint, The Hartford has yet to inform Plaintiff and Class Members of the Data Breach.

84.     Plaintiff is only aware of the Breach because he received an email from his former employer.

85.     The Hartford failed to inform Plaintiff and Class Members exactly what

---

[37]     *See, e.g.*, Adnan Raja, *How to Safeguard Your Business Data with Encryption*, Aug. 14, 2018, https://www.digitalguardian.com/blog/how-safeguard-your-business-data-encryption (last visited Aug. 10, 2023).

[38]     "Stolen Laptops Lead to Important HIPAA Settlements," U.S. Dep't of Health and Human Services (Apr. 22, 2014), available at https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

information was exposed in the Data Breach, leaving Plaintiff and Class Members unsure
as to the scope of information that was compromised and when it was taken.

86.     During this time, the cybercriminals are exploiting the information while The
Hartford may still be investigating the Data Breach.

87.     If The Hartford had investigated the Data Breach more diligently and reported it
sooner, Plaintiff and the Class could have taken steps to protect themselves sooner and to
mitigate the damages caused by the Breach.

## CLASS ALLEGATIONS

88.     Plaintiff brings this class action individually, and on behalf of all other individuals
who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

89.     Plaintiff seeks to represent a class of persons to be defined as follows:

> All individuals in the United States whose PII was compromised in
> the The Hartford Data Breach (the "Class").

90.     Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and
directors, any entity in which Defendant has a controlling interest, the legal representative, heirs,
successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is
assigned, and the members of their immediate families.

91.     This proposed class definition is based on the information available to Plaintiff at
this time. Plaintiff may modify the class definition in an amended pleading or when they move for
class certification, as necessary to account for any newly learned or changed facts as the situation
develops and discovery gets underway.

92.     **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are
at minimum, thousands of members of the Class described above. The exact size of the Class and

the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes more than 46,940 individuals.

93.    **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

      a.    Whether Defendant failed to timely notify Plaintiff and Class Members of the Data Breach;

      b.    Whether Defendant had a duty to protect the PII of Plaintiff and Class Members;

      c.    Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII, and breached its duties thereby;

      d.    Whether Defendant entered into an implied contract with Plaintiff and Class Members;

      e.    Whether Defendant breached that contract by failing to adequately safeguard Plaintiff's and Class Members' PII;

      f.    Whether Defendant was unjustly enriched and

      g.    Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct.

94.    **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class are all students or prospective students of Defendant, each having their PII exposed and/or accessed by an unauthorized third party.

95.    **Adequacy of Representation:** Plaintiff is adequate representative of the Class because his interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class

and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

96.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

97.    **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

98.    **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

99.    **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through Defendant's books and records.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
### (*On Behalf of Plaintiff & the Class*)

100. Plaintiff restates and reallege all preceding factual allegations above as if fully set forth herein.

101. Plaintiff brings this claim individually and on behalf of the Class.

102. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

103. Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

104. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By collecting and storing valuable PII that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

105. Defendant's duty also arose from its position as an insurance provider.

106. Defendant holds itself out as a trusted provider of life and accident insurance, and thereby assumes a duty to reasonably protect its clients' information. Indeed, Defendant was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

107. Defendant breached duties owed to Plaintiff and Class Members and thus was

negligent.

108.    As a result of a successful attack directed towards Defendant that compromised Plaintiff's and Class Members' PII, Defendant breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of students' or prospective students' information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its clients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

109.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been compromised.

110.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

      a.    Theft of their PII;

      b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

      c.    Costs associated with purchasing credit monitoring and identity theft protection services;

d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach— including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.    Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i.    Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j.    The diminished value of the services they paid for and received and,

k.    Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

111.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class

Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT
### (*On Behalf of Plaintiff & the Class*)

112.    Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

113.    Plaintiff brings this claim individually and on behalf of the Class.

114.    When Plaintiff and Class Members provided their PII to The Hartford, they entered into implied contracts with Defendant, under which Defendant agree to take reasonable steps to protect Plaintiff's and Class Members' PII, comply with its statutory and common law duties to protect Plaintiff's and Class Members' PII, and to timely notify them in the event of a data breach.

115.    The Hartford solicited and invited Plaintiff and Class Members to provide their PII as part of Defendant's provision of insurance services. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

116.    Implicit in the agreement between Plaintiff and Class Members and The Hartford, was Defendant's obligation to: (a) use such PII for business purposes only; (b) take reasonable steps to safeguard Plaintiff's and Class Members' PII; (c) prevent unauthorized access and/or disclosure of Plaintiff's and Class Members' PII; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or disclosure of their PII; (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized access and/or disclosure; and (f) retain Plaintiff's and Class Members' PII under conditions that kept such information secure and confidential.

117.    When entering into implied contracts, Plaintiff and Class Members reasonably

believed and expected that Defendant's data security practices complied with its statutory and common law duties to adequately protect Plaintiff's and Class Members' PII and to timely notify them in the event of a data breach.

118.    Plaintiff and Class Members paid money to Defendant in exchange for services, along with Defendant's promise to protect their PII from unauthorized access and disclosure. Plaintiff and Class Members reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. The Hartford failed to do so.

119.    Plaintiff and Class Members would not have provided their PII to The Hartford had they known that Defendant would not safeguard their PII, as promised, or provide timely notice of a data breach.

120.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

121.    The Hartford breached its implied contracts with Plaintiff and Class Members by failing to safeguard their PII and by failing to provide them with timely and accurate notice of the Data Breach.

122.    The losses and damages Plaintiff and Class Members sustained, include, but are not limited to:

       a.    Theft of their PII;

       b.    Costs associated with purchasing credit monitoring and identity theft protection services;

       c.    Costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;

       d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach— including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.    Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i.    Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j.    The diminished value of the services they paid for and received; and

k.    Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

123.    As a direct and proximate result of The Hartford's breach of contract, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

124.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (1) strength its data security systems and monitoring procedures; (2) submit to future annual audits of those systems and monitoring procedures; and (3) immediately provide and continue to provide adequate credit monitoring to Plaintiff and all Class Members.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
### (*On Behalf of Plaintiff & the Class*)

125.     Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

126.     Plaintiff brings this claim individually and on behalf of the Class in the alternative to the Second Cause of Action above.

127.     Upon information and belief, Defendant funds its data security measures from its general revenue including payments made by or on behalf of Plaintiff and Class Members.

128.     As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

129.     Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased insurance services from Defendant and/or its agents and in so doing provided Defendant with their PII.

130.     In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII protected with adequate data security.

131.     Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

132.     In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members PII and PHI.

33

Instead of providing a reasonable level of data security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits and the expense of Plaintiff and Class Members by utilizing cheaper, ineffective data security measures.

133.    Under the principles of equity and good conscience, The Hartford should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement appropriate data management and security measures that are mandated by its common law and statutory duties.

134.    Defendant failed to secure Plaintiff and Class Members' PII and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members conferred upon The Hartford.

135.    Defendant acquired Plaintiff's and Class Members' PII and PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

136.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their PII, they would not have agreed to provide their PII to Defendant.

137.    Plaintiff and Class Members have no adequate remedy at law.

138.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered injuries, including:

      a.    Theft of their PII;

      b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

      c.    Costs associated with purchasing credit monitoring and identity theft protection services;

      d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach— including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.  Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.  Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i.  Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members;

j.  The diminished value of the services they paid for and received; and

k.  Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

139.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and noneconomic losses.

140.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from

them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

**FOURTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
***(On Behalf of Plaintiff & the Class)***

141.    Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

142.    In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardian of Plaintiff and Class Members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

143.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with its clients, in particular, to keep secure their PII.

144.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period of time.

145.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff and Class Members' PII.

146.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

147.    Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff and Class Members' PII.

148.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

149.    As a direct and proximate result of Defendant's breach of its fiduciary duties. Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

### FIFTH CAUSE OF ACTION
### INVASION OF PRIVACY
### (*On Behalf of Plaintiff & the Class*)

150.    Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

151.    Plaintiff and Class Members have a legally protected privacy interest in their PII,

which is and was collected, stored and maintained by Defendant, and they are entitled to the reasonable and adequate protection of their PII against foreseeable unauthorized access, as occurred with the Data Breach.

152.    Plaintiff and Class Members reasonably expected that Defendant would protect and secure their PII from unauthorized parties and that their PII would not be accessed, exfiltrated, and disclosed to any unauthorized parties or for any improper purpose.

153.    Defendant unlawfully invaded the privacy rights of Plaintiff and Class Members by engaging in the conduct described above, including by failing to protect their PII by permitting unauthorized third parties to access, exfiltrate and view this PII.

154.    This invasion of privacy resulted from Defendant's failure to properly secure and maintain Plaintiff's and Class Members' PII, leading to the foreseeable unauthorized access, exfiltration, and disclosure of this unguarded data.

155.    Plaintiff's and Class Members' PII is the type of sensitive, personal information that one normally expects will be protected from exposure by the very entity charged with safeguarding it. Further, the public has no legitimate concern in Plaintiff and Class Members' PII, and such information is otherwise protected from exposure to the public by various statutes, regulations and other laws.

156.    The disclosure of Plaintiff's and Class Members' PII to unauthorized parties is substantial and unreasonable enough to be legally cognizable and is highly offensive to a reasonable person.

157.    Defendant's willful and reckless conduct which permitted unauthorized access, exfiltration and disclosure of Plaintiff' and Class Members' sensitive PII is such that it would cause serious mental injury, shame or humiliation to people of ordinary sensibilities.

158.    The unauthorized access, exfiltration, and disclosure of Plaintiff's and Class Members' PII was without their consent, and in violation of various statutes, regulations and other laws.

159.    As a result of the invasion of privacy caused by Defendant, Plaintiff and Class Members suffered and will continue to suffer damages and injury as set forth herein.

160.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, restitution, injunctive relief, reasonable attorneys' fees and costs, and any other relief that is just and proper.

161.    Plaintiff and Class Members are entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen their data security programs and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide robust and adequate credit monitoring to Plaintiff and Class Members; and any other relief this Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**BREACH OF CONFIDENCE**
***(On Behalf of Plaintiff & the Class)***

162.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

163.    At all times during its possession and control of Plaintiff's and Class Members' PII, Defendant was fully aware of the confidential, novel, and sensitive nature of Plaintiff's and Class Members' PII provided to it.

164.    As alleged herein and above, Defendant's possession and control of Plaintiff's and Class Members' highly sensitive PII was governed by the expectations of Plaintiff and Class Members that their PII would be collected, stored, and protected in confidence, and that it would

39

not be disclosed to unauthorized third parties.

165.    Plaintiff and Class Members provided their respective PII with the understanding that it would be protected and not disseminated to any unauthorized parties.

166.    Plaintiff and Class Members also provided their respective PII with the understanding that precautions would be taken to protect it from unauthorized disclosure, and that these precautions would at least include basic principles of information security practices.

167.    Defendant voluntarily received, in confidence, Plaintiff's and Class Members' PII with the understanding that the PII would not be disclosed or disseminated to the public or any unauthorized third parties.

168.    Due to Defendant's failure to prevent, detect, and/or avoid the Data Breach from occurring by, *inter alia*, failing to follow best information security practices to secure Plaintiff's and Class Members' PII, Plaintiff' and Class Members' PII was disclosed and misappropriated to unauthorized criminal third parties beyond Plaintiff's and Class Members' confidence, and without their express permission.

169.    But for Defendant's unauthorized disclosure of Plaintiff's and Class Members' PII, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third-party criminals. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiff's and Class Members' PII, as well as the resulting damages.

170.    The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiff' and Class Members' PII. Defendant knew or should have known that its security systems were insufficient to protect the PII that is coveted and misused by thieves worldwide. Defendant also failed to observe industry standard information security practices.

171.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered damages as alleged herein.

### SEVENTH CAUSE OF ACTION
### DECLARATORY JUDGEMENT
#### (*On Behalf of Plaintiff & the Class*)

172.    Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

173.    Plaintiff brings this claim individually and on behalf of the Class.

174.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

175.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff's and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff continue to suffer injury as a result of the compromise of his PII and remains at imminent risk that further compromises of his PII will occur in the future.

176.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

> a.    Defendant owes a legal duty to secure students' and prospective students' PII and to timely notify students and prospective students of a data breach under the common law, Section 5 of the FTC Act, and HIPAA; and

       b.     Defendant continues to breach this legal duty by failing to employ reasonable measures to secure students' and prospective students' PII.

177.    This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect students' and prospective students' PII.

178.    If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant.

179.    The risk of another such breach is real, immediate and substantial.

180.    If another breach at Defendant occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

181.    The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

182.    Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Tyler Baker, individually and on behalf of all others similarly situated, prays for judgment in his favor and against The Hartford and respectfully requests the following relief:

      a.      For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

      b.      For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

      c.      For damages in an amount to be determined by the trier of fact;

      d.      For an order of restitution and all other forms of equitable monetary relief;

      e.      Declaratory and injunctive relief as described herein;

      f.      Awarding Plaintiff reasonable attorneys' fees, costs and expenses;

      g.      Awarding pre- and post-judgment interest on any amounts awarded; and

      h.      Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

A jury trial is demanded on all claims so triable.

Dated: August 11, 2023                      Respectfully submitted,

                                                     /s/    Paul Levin, Esq.

                                                     **LEVIN, ROJAS, CAMASSAR & RECK, LLC**
                                                     Paul Levin (federal bar number 04849)
                                                     Connecticut Juris Number 400797
                                                     40 Russ Street
                                                     Hartford, Connecticut 06106
                                                     Tel. 860-834-3333

Fax. 860-471-8400
Paul@LRCR.Law


**ALMEIDA LAW GROUP LLC**
David S. Almeida*
Elena A. Belov*
849 W. Webster Avenue
Chicago, Illinois 60614
Tel: (312) 576-3024
david@almeidalawgroup.com
elena@almeidalawgroup.com

**PEIFFER WOLF CARR
KANE CONWAY & WISE, LLP**
Brandon M. Wise*
818 Lafayette Ave., Floor 2
St. Louis, MO 63104
Ph: (314) 833-4825
bwise@peifferwolf.com

*Pro Hac Vice forthcoming*

*Counsel for Plaintiff & the Class*